## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DIANE CIMINO,** | : | **No. 3:02cv1137** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **BOROUGH OF DUNMORE;** | : | |
| **DUSTBUSTERS CLEANING TEAM, INC.;** | : | |
| **ROBERT DEE; MARY RICE;** | : | |
| **SALVATORE MECCA, OTHER** | : | |
| **UNKNOWN EMPLOYEES/AGENTS** | : | |
| **OF BOROUGH OF DUNMORE,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court for disposition are Defendant Robert Dee's Motion for

Summary Judgment and a Motion for Summary Judgment filed jointly by Defendants

Borough of Dunmore, Salvatore Mecca, Mary Rice, and Other Unknown Agents of the

Borough of Dunmore (collectively " the Borough Defendants"). These matters have been

fully briefed and argued and are ripe for disposition. For the following reasons, we will deny

Dee's motion in its entirety and grant the Borough Defendants' motion in part and deny it in

part.

### I.      Factual Background

Plaintiff Diane Cimino ("Cimino") began working as a janitor for Defendant

Dustbusters Inc., in March 1998. (Defs.' Statement of Facts, Ex. E, Michelle Nardozzi Dep.

14:21-15:2) ("Nardozzi Dep."), (Defs.' Statement of Facts, Ex. D, Cimino Dep. 11:5-8)

("Cimino Dep.")  Dustbusters assigned her to work for the Borough of Dunmore in April

1998, (Nardozzi Dep. 15:1-2), where she cleaned both the Borough of Dunmore building and the Dunmore police station. (Cimino Dep. 12:5-13) She also cleaned for other Dustbusters clients. (Cimino Dep. 11:11-12:4)

Dustbusters was established in 1987 by Vanessa Miles, the company president, and Michelle Nardozzi, the vice president. (Nardozzi Dep. 5-6) Dustbusters began sending its employees to clean the Dunmore Borough building and the Dunmore police station in 1993. (Nardozzi Dep. 10: 6-8) At that time, Nardozzi and Miles performed a walk through of the Borough facilities, where a Borough representative explained what areas they wanted cleaned, and Nardozzi and Miles then determined how to clean the premises. (Nardozzi Dep. 16:3-14) No Borough representative directed how Dustbusters would clean. (Nardozzi Dep. 16: 3-7) When Cimino started, Nardozzi and Miles explained how she should clean. (Cimino Dep. 20:14-16) No borough employee or representative directed Cimino's cleaning performance. (Cimino Dep. 19:25-20:10) If the Borough wanted to alter Cimino's cleaning duties, it had to contact Dustbusters, or Cimino would have to obtain Dustbusters' authorization before complying with the request. (Nardozzi Dep. 39:8-12) Dustbusters made the decisions about which cleaning employees would service which clients, but in the event that a client was displeased with a particular employee, Dustbusters would replace that employee with another to avoid losing the client. (Nardozzi Dep. 13: 6-9, 14: 3-9) Cimino received her cleaning supplies from Dustbusters, and when she needed more, would contact Nardozzi or Miles. (Cimino Dep. 96:15-17, 97:16-19) Cimino was paid an hourly rate by

Dustbusters and received no compensation from the Borough  (Cimino Dep. 16:7-19)

Dustbusters would bill the Borough every week.  (Nardozzi Dep. 10:19-11:14)

The Borough determined when Dustbusters should send someone to clean.  (Nardozzi

Dep. 37:8-20)  In the event that the Borough needed a change in schedule, they would not

contact Cimino, but instead would inform Dustbusters, who would then contact Cimino.

(Nardozzi Dep. 17:5-18:5)  Similarly, if Cimino could not work because she was sick, she

would contact Dustbusters, not the Borough.  (Cimino Dep. 172:4-8)  On the days that

Cimino was scheduled to clean, she was able to determine her own start time based on the

convenience of the Borough.  (Nardozzi Dep. 72:15-18; Cimino Dep. 24:15-19)  She had to

arrive at the police station before the last police dispatcher left for the day because she

needed a Borough employee provide her access to the facilities.  (Cimino Dep. 24:17-19)

Generally she would arrive between three thirty and three forty-five p.m. because the

dispatchers would leave at four.  (Cimino Dep. 24:20-24)  After the dispatchers left, she was

the only person left in the building.  (Cimino. Dep. 107:10-12)

Defendant Robert Dee, a dispatcher for the Borough Police, began verbally harassing

Cimino a few months after she began cleaning the police station.  (Cimino Dep. 40:4)  He

would verbally harass her every time she saw him, which was possibly once a month.

(Cimino Dep. 35:18-36:6)  At first, he told Cimino that she "had nice breasts or a nice ass"

and that she "had a nice body."  (Cimino Dep. 32:12-21)  Then he told her, "he wanted to

make love to [her], he wanted to fuck [her] and he wanted to eat [her] on the table right

3

there" every time he saw her.  (Cimino Dep. 39:2-9)  His harassment became physical.  (Cimino Dep. 40:3-9)  Dee hugged Cimino on "a few occasions . . .[t]hroughout the police station."  (Cimino Dep. 67:10-19)  He also grabbed her buttocks and breasts and he would kiss her.  (Cimino Dep. 141:17-142:6)  Cimino testified that he would "maul me and touch me all over." (Cimino Dep. 50:2-3)

On September 11, 2000, Chief Mecca entered the police station after hours.  (Mecca Dep. 29:21-30:6, 67:13-23)  He usually left work at three p.m., (Mecca Dep. 33:18) but on that day returned to pick up a item that he had forgotten.  (Mecca Dep. 29:21-30:7)  While in his office, he viewed a surveillance monitor and saw Dee with his arms around Cimino.  (Mecca Dep. 30:1-7)  Then, after Dee left the building, Mecca claims he approached Cimino and "asked her if anybody was bothering her.  She said no.  I said, are you sure, nobody here is bothering you? No. Nobody is bothering you whatsoever? No. Okay."  (Mecca Dep. 30:21-31:2)  Mecca believed that the embrace he saw was consensual because of Cimino's response to his questioning.  (Mecca Dep. 35: 17-18, 145:5-14)  Cimino denies that this conversation took place.  (Cimino Dep. 129:23-130:6)

Mecca did, however, order Captain Patrick Reese to review the recorded surveillance from that day.  (Mecca Dep. 31:19-24, Reese Dep. I 35:9-36:5)  The recording system, however, had malfunctioned and failed to record the incident that Mecca saw on the monitor.  (Mecca Dep. 32:4-11, Reese Dep. I 35-36)  Mecca then instructed Reese to record and review the surveillance to monitor the situation when Dee and Cimino worked together.

4

(Mecca Dep. 34:15-16, Reese Dep. I 41: 23-24)  On September 26, 2000, Reese reviewed the

tape from the day before, and saw Dee embrace Cimino for about eight seconds, and Cimino

then broke the embrace.  (Reese Dep. I 54:1-25)  Dee then left the room, reentered, and

embraced Cimino again.  (Reese Dep. I at 55:2-4)  Once again Cimino broke the embrace.

(Reese. Dep. I. 55:4-6)  After reviewing that tape, Reese contacted Mecca.  (Reese. Dep. I

55:6-7)  Mecca then reviewed the tape. (Reese Dep. I 56:7-9, Mecca Dep. 71:18-20).  Mecca

agrees that the tape showed an embrace that Cimino broke.  (Mecca Dep.71:10-25)

On October 24, Reese reviewed the tape from October 23 and saw Dee

inappropriately grab Cimino's buttocks.  (Reese. Dep. I 67:18-68:13)  Mecca also viewed the

tape showing Dee grabbing for Cimino's buttocks.  (Mecca Dep. 72:2-14)  Reese next

uncovered unusual behavior on November 6, 2000  (Reese. Dep. I 70: 25-71:6)  That

recording showed, "Cimino entering the men's locker room, which is located off of the patrol

room.  Several seconds later Robert Dee enters the locker room.  Both of these individuals

were in the locker room alone for approximately ten seconds. Robert Dee then exits the

locker room."  (Reese Dep. I 71: 1-6)

At no point in the investigation did Mecca instruct Reese to question Dee about the

situation (Reese Dep. II 6:17-21), and at no point during the investigation did Mecca

approach Dee about his harassment.  (Mecca Dep. 74:18-19)  Furthermore, after Mecca

allegedly approached Cimino on September 11, 2000, he admits he neither spoke to her again

regarding the harassment nor instructed Reese to do so.  (Mecca Dep. 74:15-17, Reese Dep. I

75:1-17)  Reese never approached Cimino, (Reese Dep. I 75:8-25) and he did not approach

Dee to ask if he was having a consensual affair.  (Reese Dep. I 73:8-18)  Similarly, Reese

reported his findings solely to Mecca and did not inform anyone else of the investigation.

(Reese. Dep. I 72:1-7)  Neither Reese nor Mecca informed Dustbusters or any other Borough

official or employee about their investigation or Dee's behavior. (Id. at 72: 1-7, 84: 16-18;

Mecca Dep. 74:3-10, 122:1-4, 84-85)

　　　Cimino first informed a Borough employee of Dee's behavior on the day before

Thanksgiving, November 22, 2000.  (Cimino Dep. 45-46)  She went to Heil's bar that

evening with her husband and encountered Dunmore Police Captain Tom Bradley.  (Id.)  She

was previously acquainted with Bradley and Bradley's wife, and had cleaned Bradley's home

on a few occasions.  (Id. at 46:1-6)  She told Bradley that "Bobby Dee is bothering me,

harassing me." (Id. at 46:19-23)  Bradley responded that he would speak with her at another

time.  (Id. at 46:23-25)

　　　On November 26, 2000, Bradley brought Cimino's complaints to Mecca's attention.

(Mecca Dep.75: 20-25)  Mecca informed Reese and the Borough Mayor of the complaint, but

did not tell anyone else.  (Id. at 76:1-5, 77:13-17)  Mecca directed Bradley to give a statement

to Reese.  (Id. at 76:24-77:2)  Mecca ordered Reese to interview Cimino.  (Reese Dep. II

16:15-17)  Reese took a written statement from Cimino on December 11, 2000.  (Id. at 9:3-7,

Cimino Dep. 77:12-16)  On December 12, 2000, Borough Manager Mary Rice and Mecca

discussed the allegations, (Rice. Dep. 14:18-20) and Rice reported it to the Borough Council.

6

(Id. at 15:23-16:11)  The Borough Council, Rice, and Mecca then met to discuss the situation.  (Id. at 16:9-13)  Rice first learned of Cimino's complaints from Mecca that day, (Id. at 14:12-20), but had been aware of Mecca's ongoing investigation before Cimino verbally complained of the harassment. (Id. at 39:1-6)  Additionally, Rice, Mecca, and the Borough Solicitor met with Dee on December 12.  (Mecca Dep. 91:4-9)

On December 11 or 12, at some point after Cimino gave her statement to Reese, she also complained to Nardozzi.  (Cimino Dep. 84:23-85:8, Nardozzi 26:2-5)  Cimino had not previously informed Nardozzi or Miles of Dee's behavior.  (Cimino Dep. 85:9-13,102:24-103:1)  In response, Nardozzi informed her that she would no longer clean the police station. (Cimino Dep. 85:22-86:3)  Afterwards, Nardozzi spoke with Pat Reese and Mary Rice. (Nardozzi Dep. 28:12-14).  Nardozzi explained that Cimino had a complaint, and Dustbusters intended to remove her from the borough building, and Rice agreed.  (Nardozzi Dep. 30:3-19)

 On December 14, the Borough held an executive session to discuss the allegations. (Rice Dep. 26:3-7)  Rice, the Mayor, Council Members, and Borough Solicitor were present. (Rice. Dep. 26:11-13)  The Borough assigned Mecca to investigate the incident.  (Rice Dep. 27:7)  The Borough suspended Dee as a result of the incident.  (Mecca Dep. 107:21-23)

Cimino was removed from cleaning the police station, but continued to clean the Borough building.  (Nardozzi Dep.  22:12-19)  After Cimino worked two nights at he Borough building, Nardozzi removed her completely from cleaning the Borough because of

7

the proximity of the two buildings.  (Nardozzi Dep. 23:5-12)  Rice believes she had input in

the decision to completely remove Cimino from the buildings.  (Rice 62:18-23)  After

Cimino left the borough buildings to clean other facilities, her superiors at Dustbusters began

to ignore her and refused to say hello.  (Cimino Dep. 13:10-15)  The Dustbusters women

would not look at her and refused to answer her phone calls.  (Cimino Dep. 188:21-189:9)

Thus, she felt it would be best for her to leave Dustbusters under these conditions, and she

stopped working for Dustbusters.  (Cimino Dep. 13:10-15)

## II.      Procedural Background

On July 2, 2002, Cimino filed a ten count Complaint against the Borough,

Dustbusters, Dee, Rice, and Mecca.  Count I advances a claim for sexual discrimination

pursuant to Title VII, 42 U.S.C. §§ 2000e-2000e-17 against the Borough and Dustbusters.

Count II is a 42 U.S.C. § 1983 claim against the Borough, Dee, Rice, and Mecca for

constitutional violations.  Count III is a 42 U.S.C. § 1985(3) claim against Dustbusters, the

Borough, Dee, Rice, and Mecca for conspiracy to deprive Cimino of the equal protection of

the law.  Count IV asserts that the Borough, Dustbusters, Dee, Rice, and Mecca violated the

Pennsylvania Human Relations Act ("PHRA"), 42 PA. CONS. STAT. ANN. §§ 951-63.  Count

V is a PHRA retaliation claim against the Borough, Dustbusters, Dee, Rice, and Mecca.

Count VI is a negligent supervision claim against the Borough, Rice, and Mecca.  Count VII

is a negligent retention claim against the Borough, Rice, and Mecca.  Count VIII is a battery

claim against Dee.  Count IX is an assault claim against Dee.  Finally, Count X is an

8

intentional infliction of emotional distress claim against Dee.

On August 29, 2003, we dismissed numerous claims pursuant to Federal Rule of Civil Procedure 12(b)(6). We granted the Borough's motion to dismiss Count VI, negligent supervision, and Count VII, negligent retention, because the Borough was entitled to official immunity. We denied Rice and Mecca's motion to dismiss these same claims. Additionally, we granted Dustbusters' motion to dismiss the hostile work environment claims in Count I and IV. We denied Dustbusters' motion to dismiss the retaliation claims in Count I and V, and the conspiracy claim in Count III.

## III.   Jurisdiction

As this case is brought pursuant to 42 U.S.C. § 1983 for constitutional violations we have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

## IV.   Standard

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v.

9

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

## V.    Discussion

The Borough Defendants have filed a joint motion for summary judgment, Dee has seperately moved for summary judgment, and Dustbusters currently has no motions pending before the Court. Therefore, we will consider the Borough Defendants' joint motion and Dee's motion seperately.

10

**A.      The Borough Defendants' Motion**

The Borough Defendants seek to dismiss all claims pending against them.  At present,

Cimino has a Title VII claim against the Borough, 42 U.S.C. § 1983 and 42 U.S.C. § 1985

claims against Rice, Mecca, and the Borough, and negligent supervision and retention claims

against Rice and Mecca.

**1.      Title VII**

The Borough Defendants argue that Cimino was not an employee of the Borough, and

was an employee of Dustbusters only, and therefore her Title VII claims must fail.  Cimino

responds that the Borough was her co-employer.

Under Title VII, it is "an unlawful employment practice for an employer– (1) to fail or

refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-

2(a)(1).  Courts should not seek to determine whether the plaintiff is technically an employee

of the defendant, but instead must discern "the level of control an organization asserts over

an individual's access to employment and the organization's power to deny such access."

Graves v. Lowery, 117 F.3d 723, 728 (3d Cir. 1997) (citing Sibley Mem'l Hosp. v. Wilson,

488 F.2d 1338, 1342 (D.C. Cir. 1973)).[1]  "[T]he precise contours of an employment

---

[1] The Borough Defendants attack the plaintiffs claims pursuant to both Title VII and the
PHRA.  We will not engage in a separate analysis of the PHRA claims because the PHRA and Title
VII are to be interpreted consistently.  Doe v. Kohn Nast & Graf, 862 F. Supp. 1310, 1323 (E.D. Pa.
1994).

relationship can only be established by a careful factual inquiry." Id. at 729 (citation omitted).

Our careful factual inquiry is guided by the factors enunciated in Nationwide Mutual Insurance Company v. Darden, 503 U.S. 318, 322-24 (1992). There, the Court held that when a statute containing the term "employee" does not define the term, or defines it in a completely circular fashion, the court should apply the common law definition. Id.[2] The Darden level of control inquiry allows courts to distinguish whether the plaintiff is an employee or independent contractor of the defendant. O'Connor v. Davis, 126 F.2d 112, 115 (2d Cir. 1997).

However, we must navigate this distinction "only in situations that plausibly approximate an employment relationship." Id. (quoting Graves v. Women's Prof'l Rodeo Assoc., 907 F.2d 71, 74 (8th Cir. 1990)). Where the plaintiff received no compensation from the defendant, she cannot plausibly assert she was an employee. Id.

> Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because although 'compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, it is an essential condition to the existence of the employer-employee relationship.'

Id. at 115-16 (quoting Graves, 907 F.2d at 73).

Thus, where a plaintiff receives no compensation from the defendant, she cannot

---

[2] While the Supreme Court formulated this test in the ERISA context, it also applies in the Title VII context. See, e.g., Alberty-Velez v. Corporación De Puerto Rico Para La Difusión Pública, 361 F.3d 1, 11 (1st Cir. 2004) (applying the Darden rationale to Title VII because Title VII and ERISA contain the same definition of "employee").

plausibly argue that she was an employee and the court need not engage in an analysis of the

defendant's level of control over the plaintiff.  Id.  In O'Connor, the plaintiff worked as an

intern for the defendant mental hospital to satisfy the field work component of her major for

college graduation.  Id. at 113.  As compensation for her time, her college paid her federal

work study funds.  Id.  She filed a Title VII suit against the hospital alleging gender

discrimination.  Id. at 114.  The district court granted summary judgment for the hospital

because it was not the plaintiff's employer for the purposes of Title VII.  Id.  The Second

Circuit affirmed, reasoning "'a title VII plaintiff is only an employee if the defendant both

pays him and controls his work."  Id. at 116.  Thus, since the plaintiff was neither hired nor

paid by the defendant, her relationship with the defendant did not fall within the contours of

the "conventional master-servant relationship."  Id. at 115.  The court found, "it is

uncontested that O'Connor received from [the hospital] no salary or other wages, and no

employee benefits such as health care, vacation, or sick pay, nor was she promised any such

compensation."  Id.; see also  Kemether v. Pennsylvania Interscholastic Athletic Assoc., 15

F. Supp. 2d 740, 745 (E.D. Pa. 1998) (holding that a basketball referee was not an employee

of the athletic association because she received no compensation or benefits from the

association, but instead was paid by the individual schools).

The present situation is analogous to O'Connor and Kemether because Cimino

received no direct or indirect compensation from the Borough, and instead was paid by a

third party, Dusbusters. (Cimino Dep. 16; Nardozzi Dep. 80:10-14).  Cimino's argument that

she was the Borough's employee would require this Court to stretch the definition of

employee to include individuals not hired or paid by the alleged employer.  We find that the

"preliminary question of remuneration is dispositive in this case," O'Connor, 126 F.3d at

116, and Cimino has not created a genuine issue of material fact that the Borough was her

employer.

Furthermore, our analysis of the common law agency test establishes that the Borough

did not control the methods or means of Cimino's employment.  The Darden Court explained

the relevant factors.

> In determining whether a hired party is an employee under the general
> common law of agency, we consider the hiring party's right to control the
> manner and means by which the product is accomplished.  Among the other
> factors relevant to this inquiry are the skill required; the source of the
> instrumentalities and tools; the location of the work; the duration of the
> relationship between the parties; whether the hiring party has the right to
> assign additional projects to the hired party; the extent of the hired party's
> discretion over when and how long to work; the method of payment; the hired
> party's role in hiring and paying assistants; whether the work is part of the
> regular business of the hiring party; whether the hiring party is in business; the
> provision of employee benefits; and the tax treatment of the hired party.

Darden, 503 U.S. at 323-24 (quoting Community for Creative Non-Violence v. Reid, 490

U.S. 730, 740 (1989)).

When the Borough hired Dustbusters, the Borough directed what needed to be

cleaned, but Dustbusters determined how to clean the building.  (Nardozzi Dep. 38-39;

78:17-20)  Dustbusters provided Cimino with the initial and replacement cleaning supplies.

(Cimino Dep. 96:15-17)  The Borough could not assign additional tasks to Cimino absent

Dustbusters' approval.  (Nardozzi Dep. 39:8-12)  Furthermore, the Borough did not pay

14

Cimino (Cimino Dep. 16); it had to contact Dustbusters, not Cimino, to change the cleaning schedule (Nardozzi Dep. 18:1-5);  Dustbusters determined who would clean the Borough (Nardozzi Dep. 13:6-9); the Borough had no input into Dustbusters' selection of Cimino's replacement (Nardozzi Dep. 34:1-19); Cimno was hired by Dustbusters and assigned to work for the Borough (Nardozzi Dep. 15:1-2); and finally, the Borough did not terminate Cimino, she was reassigned by Dustbusters and continued to work after she left the Borough. (Cimino Dep. 113:24-115:9).

Cimino argues that Graves v. Lowery, 117 F.3d 723 (3d Cir. 1997) establishes that the Borough was her co-employer along with Dustbusters.  We disagree, and find Graves distinguishable.  There, the court analyzed whether Pennsylvania county court clerks, who were formally considered state employees, could pursue Title VII claims for employment discrimination against their county.  Id. at 724.  Although the county paid the clerks, it argued that it was not their employer because they served at the discretion of a state district justice, who had an inherent right to hire, discharge, and supervise the employees.  Id. at 727.  The court stated "the precise contours of an employment relationship can only be established by a careful factual inquiry."  Id. at 279.  It then found that the clerks alleged sufficient facts to establish that the county was their co-employer because they were paid by the county and were covered by county personnel policies, including holidays, vacation time, maternity leave, and sick leave.  Id. at 727 & n.8.  Furthermore, the clerks were covered by the county's sexual harassment policy, they were subject to termination by the county, and two of the

clerks in question were hired by the county.  Id.

We find Graves easily distinguishable.  Significantly, unlike the clerks in Graves,

Cimino was not paid by her alleged co-employer.  Cimino was paid an hourly rate by

Dustbusters and received no compensation from the Borough.  (Cimino Dep. 16; Nardozzi

Dep. 80:10-14)  Furthermore, Cimino has produced no evidence that she was subject to

Borough personnel policies such as sick leave, maternity leave, or vacation time.  If Cimino

could not work because she was sick, she would contact Dustbusters, not the Borough.

(Cimino Dep. 172:4-7)  Dustbusters would then send another employee to clean the Borough

and the Borough had no choice of replacement.  (Nardozzi Dep. 79:19-80:5)[3]  Moreover, the

Borough did not hire or fire her.  Dustbusters hired her in March 1998 and assigned her to

shifts at the Borough a month later.  (Nardozzi Dep. 15:1-2)  The Borough never terminated

her employment, Dustbusters reassigned her to other locations, including a doctor's office

and a bank.  (Cimino Dep. 86-88)[4]

---

[3] Cimino's brief argues that the Borough subjected Cimino to its rules, regulations, and policies, including its sexual harassment policy.  This argument, however, is not supported by the record. Cimino cites to pages 97 and 98 of Nardozzi's deposition, wherein Nardozzi stated that she would expect sexual harassment laws to protect her cleaning employees when they were on site. (Nardozzi Dep. 97:22-98:2).  This says nothing regarding the existence of any Borough policies or rules covering Cimino.  Cimino also cites to Rice's deposition at page 29 for the proposition that the Borough discrimination policy applied to Cimino.  There, Rice stated that she expected that federal discrimination laws would protect everyone on Borough premises.  (Rice Dep. 29:8-18).  Neither Rice nor Nardozzi, nor any other witness testified that the Borough had a policy or rule that applied to Cimino.  Rather, Rice and Nardozzi assumed that discrimination laws would protect her.

[4] The parties dispute whether the Borough had input into whether Cimino would be removed from the Borough building after she made her sexual harassment accusations.  We find this fact immaterial.  The relevant inquiry is whether the Borough could terminate Cimino's employment, and it could not.  She continued in the same employment after she was removed from the Borough

Given the above factors, no reasonable jury could conclude the Borough was Cimino's

employer.  The Borough did not hire her, pay her, or terminate her employment.  The

minimal control that it asserted over Cimino was purely as a customer of Dustbusters, not as

Cimino's employer.  Therefore, we will dismiss Counts I, IV, and V against the Borough.

**2.  Section 1983**

Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983.

Thus, to establish a claim under § 1983, two criteria must be met.  First, the conduct

complained of must have been committed by a person acting under color of state law.

Second, the conduct must deprive the complainant of rights secured under the Constitution or

federal law.  Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d

Cir. 1998).

To bring a claim under § 1983 for sexual harassment that amounts to a denial of equal

protection, Cimino must prove the existence of purposeful discrimination.  Andrews v. City

building.  To the extent that the Borough may have asserted influence over Cimino's removal, it was
solely as a customer of Dustbusters, not as Cimino's employer.  That Dustbusters may pay heed to
the complaints of its customers does not render all of its customers co-employers of its employees.

17

of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing Baston v Kentucky, 476 U.S. 79,

93 (1986)).  She must show that she was treated differently from individuals similarly

situated because of her gender.  Id. (citations omitted).  Defendants Mecca, Rice, and the

Borough seek summary judgment on the § 1983 claim because they argue they did not

personally contribute to the sexual harassment.  First we will address Mecca and Rice's

supervisory liability, and then we will address whether the Borough may be held liable as a

municipality.

> ### a.    Rice and Mecca

Rice and Mecca argue that they have no liability because supervisory liability in §

1983 claims cannot be based solely upon the doctrine of *respondeat superior*, and a

defendant must have personal involvement in the alleged wrongs.  Robinson v. Pittsburgh,

120 F.3d 1286, 1294 (3d Cir. 1997) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d

Cir. 1988).  We find a genuine issue of material fact with regard to whether Rice and Mecca

had sufficient personal involvement.

Supervisory liability may be shown "through allegations of personal direction or of

actual knowledge and acquiescence."  Id. (citations omitted).  "When a supervisor with

authority over a subordinate knows that the subordinate is violating someone's rights but fails

to act to stop the subordinate from doing so, the factfinder may usually infer that the

supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct."

Id.

18

Rice and Mecca argue that Cimino failed to produce evidence that they had knowledge of and acquiesced to the harassment.  Specifically, Rice argues that she took immediate action upon learning of the sexual harassment, and Mecca argues that he did not know because Cimino denied that Dee harassed her.  We find these arguments unsupported by the facts.

On September 11, 2000, Chief Mecca witnessed Dee place his arms around Cimino. (Mecca Dep. 20, 67:13-23)  Mecca claims that he then confronted Cimino, and she denied that anybody in the police station was "bothering" her."  (Mecca Dep. 30:23-31:1-2)  Cimino denies that this conversation took place.  (Cimino Dep. 47:10-24, 129:23-130:6)  Mecca subsequently reviewed videotape on September 26, 2000 that showed Dee embrace Cimino twice, and Cimino break the embraces.  (Mecca Dep. 71)  Mecca reviewed a surveillance tape from October 23, 2000 that showed Dee reaching for Cimino's buttocks in an attempt to grab her inappropriately.  (Mecca Dep. 72)  Mecca failed to take any action regarding these incidents.  He never approached Dee about possible harassment (Mecca Dep. 74:18-19), and he never approached Cimino.  (Cimino Dep. 47:10-24, 129:23-130:6)  Mecca never informed Dustbusters or any other borough official of the investigation or the results until Cimino complained to Captain Bradley.  (Mecca Dep. 74:3-10, 84-54, 122:1-4)

Mecca's investigation provided ample evidence that Dee was sexually harassing Cimino, and a reasonable jury could find that Mecca's failure to act demonstrates he acquiesced in the behavior.  Despite his power to control the situation, Mecca took no steps

to intervene.

Rice testified inconsistently about when she learned about the harassment.  She repeatedly testified that she learned of the harassment on December 12, 2002.  However, on one occasion, she admitted that she knew that Mecca was investigating complaints of sexual harassment even before Cimino verbally complained.  (Rice. Dep. 39:1-16)  The investigation uncovered videotape evidence that Dee was harassing Cimino.  Rice testified that she took action only after the verbal complaint (Rice. Dep. 14)  Thus, a reasonable jury could conclude that she knew of the harassment while it was on-going, but failed to act to prevent it.  Therefore, we find a genuine issue of material fact regarding whether Rice knew of and acquiesced to Dee's harassment.

Thus, this matter presents factual and credibility issues that are inappropriate for resolution at the summary judgment stage, and can be resolved only by a jury at trial. Accordingly, we will deny Mecca and Rice's motion for summary judgment on the § 1983 count.[5]

### b.    The Borough

The Borough cannot be held liable as a municipality for the constitutional torts of its

---

[5] Mecca and Rice also argue that the section 1983 claims should be dismissed based on qualified immunity.  "A public official's actions are protected by qualified immunity if s/he can show that the 'offending' conduct did not violate 'clearly established statutory or constitutional rights which a reasonable person should have known." Andrews v. Philadelphia, 895 F.2d at 479. We find they are not entitled to qualified immunity.  Qualified immunity does not protect defendants that "treat[], or allow[] their subordinates to treat, female employees differently on the basis of gender in their work environment." Id.

employees based solely on the doctrine of *respondeat superior*.  Robinson, 120 F.3d at 1295

(citing Monell v. Dept. of Social Services, 436 U.S. 658 (1978)).  "Municipal liability

attaches only 'when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

inflicts the injury' complained of."  Id. (quoting Monell, 436 U.S. at 694).  A plaintiff can

demonstrate that a municipality's course of conduct amounts to government policy when "a

decisionmaker possessing final authority to establish municipal policy with respect to the

action 'issues an official proclamation, policy, or edict.'"  Andrews, 895 F.2d at 1480

(quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).

     In Andrews, the court found that a police commissioner's acquiescence to his

subordinate's decisions were sufficient to establish municipal liability.  Id. at 481.  A police

captain ignored foul language and pornographic materials in the workplace, ignored female

employees' reports of stolen files although male employees never had similar problems, and

he cautioned a female complaining of improper behavior that she should expect it.  Id. at

1479.  The court found that the municipality could be liable if the police commissioner

"knowingly acquiesced" to the Captain's decisions.  Id. at 1481.  "If the authorized

policymakers approve a subordinate's decision and the basis for it, their ratification would be

chargeable to the municipality because their decision is final."  Id. (quoting City of St. Louis

v. Praprotnik, 485 U.S. 112, 127 (1988)).

     We find that Mecca was a policymaker and a reasonable jury could conclude that he

was motivated by sexual animus in acquiescing to Dee's sexual harassment.  As Police Chief,

Mecca compiled the employee handbook for the police department, including rules,

regulations, and standard operating procedures.  (Mecca Dep. 46:18-20).  When he became

chief, he revised the standard operating procedures.  (Id. at 47:10-18).  He distributed the

revised procedures to all borough officers.  (Id. at 50:7-9).  He also had the authority to

initiate an investigation into potential sexual harassment after witnessing Cimino and Dee

embrace on September 11, 2000.  (Mecca Dep. 30:19-25).  Thus, he was a policymaker.

Second, for the reasons discussed previously regarding Mecca's supervisory liability,

we also find that a reasonable jury could conclude that Mecca acquiesced in Dee's behavior

and the basis for it.  Therefore, we will deny the Borough's motion for summary judgment on

Cimino's § 1983 claim.

### 3.    Section 1985

In order to prove that a defendant violated Section 1985, a plaintiff must show that he:

> (1) conspired,
> (2) for the purpose of depriving, either directly or indirectly, any person
> or class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws,
> (3) that the conspirators did, or caused to be done, any act in furtherance
> of the object of the conspiracy, and
> (4) that plaintiff was
> (a) injured in his person or property, or
> (b) deprived of having and exercising any right or privilege of a citizen
> of the United States.

Gobla v. Crestwood School, 609 F. Supp. 972, 979 (M.D. Pa. 1985) (citing Great American
Fed. Savings & Loan Association v. Novotny, 442 U.S. 366, 372 (1979)).

A conspiracy is "an agreement by two or more persons."  BLACKS LAW DICTIONARY

(8th ed. 2004).  Mecca, Rice, and the Borough argue that we should dismiss this claim

because Cimino has produced insufficient evidence that two or more persons agreed to take

action against her.  Specifically, they argue that the Borough Defendants and Dustbusters

never agreed to take action against Cimino, and there can be no conspiracy solely among the

Borough Defendants because a corporation cannot conspire with its officers and directors.

We find that Cimino has presented evidence that Dustbusters and Rice agreed to take action

against Cimino, and thus the defendants' argument has no merit.  Rice and Nardozzi spoke

following Cimino's complaints and agreed to remove Cimino from the Borough.  (Nardozzi

Dep. 29:24-30:7).  Additionally, Rice had input into the decision to remove Cimino.  (Rice

Dep. 62:21-23).  Therefore, contrary to the Borough Defendants' argument, there is a

genuine issue of material fact that Dustbusters and the Borough defendants agreed to take

action against Cimino.  See Robison v. Canterbury Village, Inc., 848 F.2d 424, 431 (3d Cir.

1988) ("[A] section 1985(3) conspiracy between a corporation and one of its officers may be

maintained if the officer is acting in a personal, as opposed to official, capacity, or if

independent third parties are alleged to have joined the conspiracy.").   Therefore, we find a

genuine issue of material fact that two or more persons entered into an agreement and we will

deny summary judgment.

    **4.**    **Negligent Retention/Supervision**

Rice and Mecca argue that they are entitled to official immunity on Cimino's common

law claims because she cannot demonstrate that their actions constituted willful misconduct.[6]

Rice and Mecca argue that we should grant summary judgment because they are entitled to

official immunity under the Pennsylvania Tort Claims Act ("PTCA"), 42 PA. CONS. STAT.

ANN. §§ 8542-50.  A local agency is generally immune from state law liability, with a few

specifically enumerated exceptions not applicable here.  42 PA. CONS. STAT. ANN. § 8542.

An employee of a local agency is liable for acts within the scope of his duties to the same

-------------------

[6] Rice also argues that she cannot be held liable for negligent supervision or retention because she was not Dee's direct supervisor.  Pennsylvania Courts have adopted Restatement (Second) of Torts § 317 to guide the evaluation of negligent retention and supervision claims.  See Schofield v. Trustees of the University of Pennsylvania, 894 F. Supp. 194, 196 (E.D. Pa. 1995) (citing Dempsey v. Walso Bureau, Inc., 246 A.2d 419, 421 (Pa. 1968)); Cox v. Roxborough Mem. Hosp., 708 A.2d 490, 496 (Pa. Super. Ct. 1998).

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
> (a) the servant
> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> (ii) is using a chattel of the master, and
> (b) the master
> (i) knows or has reason to know that he has the ability to control his servant, and
> (ii) knows or should have reason to know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317.

The central issue is whether "the employer knew, or in the exercise of ordinary care, should have known of the necessity for exercising control over his employee."  Schofield, 894 F. Supp. at 196 (quoting Dempsey, 246 A.2d at 422).  First, Rice argues that she is not liable because she was not Dee's direct supervisor.  Rice, however, supervised Mecca, who was Dee's direct supervisor.  (Rice Dep. 10:23-11:5).  "For liability purposes, a subagent is treated as an agent, and a subservant is treated as a servant."  Kemether v. Pennsylvania Interscholastic Athletic Association, Inc., 15 F. Supp. 2d 740, 751 (E.D. Pa. 1998).  Therefore, Rice may be liable even though she did not directly supervise Dee.

extent as his employer.  42 PA. CONS. STAT. ANN. § 8545.  An employee is not immune, however, from damages caused by an "act of crime, actual fraud, actual fraud, actual malice or willful misconduct."  42 PA. CONS. STAT. ANN. § 8542(a)(2).

Cimino argues a reasonable jury could find that Rice and Mecca's actions fall under the willful misconduct exception.  We agree.  Mecca was aware of the harassment on September 11, 2000, and took no action to prevent Dee's behavior until after Cimino complained to Captain Bradley in late November.  Similarly, Rice testified that she was aware of the investigation before Cimino complained, yet took no remedial steps until Cimino spoke with Captain Bradley.

In DiSalvio v. Lower Merion High School District, 158 F. Supp. 2d 553 (E.D. Pa. 2001) the court addressed whether the supervisors of a high school football coach engaged in "willful misconduct" when they ignored the coach's sexual harassment of a student manager. The court found that the immunity did not apply because the plaintiff "alleged facts sufficient to give rise to the reasonable inference that these Defendants were on notice about the harassment and knew or should have known that their nonfeasance would allow the harassment to continue or worsen."  Id. at 564.  Here, Cimino has presented sufficient evidence to create a genuine issue of material fact that Rice and Mecca were on notice of the harassment and knew that their failure to intervene would allow the harassment to continue or worsen.  Accordingly, we will deny summary judgment on Cimino's negligent supervision and retention claims.

Therefore, in sum, we will grant the Borough Defendants' Motion for Summary

Judgment on Cimino's Title VII and PHRA claims because the Borough was not her

employer, but we will deny the Motion in all other respects.

**B**.     **Dee Motion**

Dee raises three issues on summary judgment.  First he argues that Cimino has failed

to create a genuine issue of material fact on her § 1983 sexual harassment claim.  Second, he

argues that we should dismiss Cimino's claims for lost wages.  Finally, he argues that we

should grant summary judgment on Cimino's claim for punitive damages because the PHRA

does not provide for such a recovery.[7]  We will address these issues seperately.

**1.     Sexual Harassment**

Dee argues that Cimino cannot establish a § 1983 sexual harassment claim because the

alleged harassment was neither gender based nor pervasive and severe.

We find Dee's arguments without merit.  Cimino testified that Dee repeatedly touched

her in a sexual manner, and used sexual language towards her.  Every time Dee would work

with Cimino, he commented on her breasts and buttocks. (Cimino Dep. 35:12-21)  Dee told

Cimino he wanted to make love to her, he wanted to "fuck" her, and he wanted to "eat [her]

on the table right there." (Cimino Dep. 39:2-4)  The harassment continued over a year and a

half. (Cimino Dep. 191:17-20)  For a while, the harassment escalated to physical touching,

---

[7] Dee additionally argues that we should dismiss Cimino's PHRA claim against him because
the PHRA does not provide for individual liability.  Cimino agrees and has withdrawn her PHRA
claim against Dee.  Cimino has also withdrawn her Count X claim for intentional infliction of
emotional distress.

and Cimino testified that Dee would "maul" her, touch her all over her body, and try to kiss

her.  (Cimino Dep. 50:1-5)   Dee touched her buttocks.  (Cimino Dep. 55:20-21)   Dee

touched her in a harassing manner every time he saw her from the summer of 1998 until

Cimino reported the behavior to Captain Bradley in 2000.  (Cimino Dep. 142:13-19)

Furthermore, based on the Court's review of the videotapes of Dee's behavior, a

reasonable jury could interpret the videotape as depicting Dee sexually touching Cimino

against her will.  Therefore, we find a genuine issue of material fact that Dee's behavior

constituted gender biased discrimination and was sufficiently pervasive and severe to alter

the conditions of Cimino's employment.

### 2.	Lost Wages

Dee's argument that Plaintiff cannot recover lost wages against him because she was

not constructively discharged is equally meritless.  A § 1983 plaintiff can recover lost wages

as part of the actual damages caused by a constitutional violation.  See Brooks v. Andolina,

826 F.2d 1266, 1269-70 (3d Cir. 1987).  Cimino has produced evidence that as a result of

Dee's harassment, she was transferred out of the Borough, thus diminishing her wages.

Therefore, we will deny Dee's motion for summary judgment on Cimino's claims for lost

wages.

### 3.	Punitive Damages

Dee requests that we grant summary judgment on the issue of punitive damages

because they are not available under the PHRA.  This is irrelevant.  Cimino has withdrawn

her PHRA claim against Dee, but continues to seek punitive damages against him in Count II pursuant to § 1983, Count III pursuant to § 1985, Count VIII for Battery, Count IX for Assault, and Count X for Intentional Infliction of Emotional Distress.  Therefore, even if Cimino cannot recover punitive damages pursuant to the PHRA, she seeks punitive damages pursuant to a variety of alternative theories.  Therefore, we will not grant summary judgment on Cimino's claim for punitive damages, and we will deny Dee's Motion in its entirety.

### VI.    Conclusion

For the reasons expressed above we will grant the Borough Defendants' Joint Motion for Summary Judgment in part and deny it in part.  We will grant summary judgment for the Borough on Count I, IV, and V because it was not Cimino's employer for the purposes of Title VII and the PHRA.  We will deny the Motion as to the remaining claims.  Furthermore, we will deny Dee's Motion in its entirety, although we will dismiss the PHRA and intentional infliction of emotional distress claims as withdrawn.

Therefore, having resolved the defendants' motions to dismiss and motions for summary judgment, the following claims remain for trial: Count I, Title VII retaliation, against Dustbusters; Count II, 42 U.S.C. § 1983, against the Borough, Dee, Mecca, and Rice; Count III, 42 U.S.C. § 1985(3) conspiracy, against the Borough, Dustbusters, Dee, Mecca, and Rice; Count V, PRHA retaliation against Dustbusters; Count VI, negligent supervision against Mecca and Rice; Count VII, negligent supervision against Mecca and Rice; Count VIII, battery against Dee; and Count IX, assault against Dee.  An appropriate order follows.

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DIANE CIMINO,** | : | No. 3:02cv1137 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| **BOROUGH OF DUNMORE;** | : | |
| **DUSTBUSTERS CLEANING TEAM, INC.;** | : | |
| **ROBERT DEE; MARY RICE;** | : | |
| **SALVATORE MECCA, OTHER** | : | |
| **UNKNOWN EMPLOYEES/AGENTS** | : | |
| **OF BOROUGH OF DUNMORE,** | : | |
| Defendants | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 21st day of December 2005, it is hereby **ORDERED** that:

1.   The Borough Defendants Renewed Motion for Summary Judgment (Doc.105) is **GRANTED** in part and **DENIED** in part.  Summary judgment is granted on Counts I, IV, and V, but denied in all other respects.

2.   Defendant Robert Dee's Renewed Motion for Summary Judgment (Doc. 100) is **DENIED**.

**BY THE COURT:**


**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**